UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| JOHN FORST and CHRISTINE HOPKINS,<br><br>Plaintiffs,<br><br>v.<br><br>TRAVELERS HOME AND MARINE INSURANCE COMPANY,<br><br>Defendant. | CAUSE NO. 1:21-CV-227 DRL |

<u>OPINION AND ORDER</u>

John Forst and Christine Hopkins own a home in Huntertown, Indiana. While they enjoyed a vacation, a friend discovered widespread water damage in their home. The homeowners made a claim to their insurer, Travelers Home and Marine Insurance Company. Travelers denied coverage. The homeowners thereafter sued for breach of contract and bad faith. Crossmotions for summary judgment now pend—the homeowners request partial summary judgment on the contract claim, and Travelers seeks summary judgment on all claims. The court permits only the contract claim to proceed to trial.

BACKGROUND

John Forst and Christine Hopkins purchased their home in Huntertown, Indiana in 2008. As many homeowners do, they insured their home. Travelers issued a policy for the home effective August 29, 2020 through August 29, 2021 [25-1]. In November 2020, the couple left for an extended vacation to Florida. They asked their family friend, Therese Brown, to check on the home while they were away [58-3 Tr.11]. She checked the house every couple weeks or so [58-3 Tr.12]. Before leaving for Florida, the homeowners had never seen any mold in the home [58-4 Tr.13].

On February 6, 2021, Ms. Brown discovered widespread water and mold damage in the house. The master bedroom was most affected (*see* Figure 1 *infra*), but nearly every room had at least some

damage [58-8 Tr.9]. Ms. Brown immediately contacted the homeowners [58-3 Tr.27], and the homeowners provided notice of the loss to Travelers that same day [58-7 at 2].




**Figure 1**
**Master Bedroom**

The damage required parts of the house to be gutted, so upon returning to Indiana the homeowners moved out. An investigation followed; and, during this time, both the homeowners and insurer explored theories about the cause. Initially, both thought an ice dam caused the ceiling to fall [58-7 at 6]. When the cold thawed and engineers could inspect the roof in March, they found no evidence to support the ice dam theory [58-7 at 21]. From there, the parties diverged on the cause of damage, and a string of engineers and other specialists tried to figure out how the home became so damaged.

On March 18, 2021, Travelers turned to a "rain forest theory," hypothesizing that the moisture preexisted and caused the damage [58-7 at 21]. The insurer noted at the time that the rain forest theory, based on a speculated HVAC system issue, was "just a theory" [58-7 at 21]. Five days later, Travelers consulted a mechanical engineer (Richard Rambacher) about this rain forest theory [58-7 at 23]. He requested information about the home's HVAC system and told Travelers that when temperatures drop, systems can cause a house's humidity levels to get too high if they aren't set properly or aren't automatic

[58-7 at 23]. On April 8, Travelers told the homeowners that the company was still awaiting this engineer's report and would not pay until it confirmed the cause of the loss [58-7 at 25].

Already, on March 29, Travelers had retained a forensic engineer (Eric Bates) from Nederveld, Inc. to inspect the home [58-9]. Nederveld found no issues with the furnace or humidifier and found no leaks in the home [58-9 at 4; 58-14 Tr.23]. Nederveld instead reported a problem with the drywall fasteners in the ceiling—they had been spaced incorrectly, out of conformance with general standards for installation [58-9 at 5]. Nederveld concluded that the drywall's weight over time, coupled with the weight of the insulation, caused the ceiling gypsum board to fail. The collapse caused cold air from the attic and warm air from the home to combine, creating a moisture rich environment that led to mold and water damage [58-9 at 5], including in other areas of the home (*see* Figure 2).



**Figure 2**
**Moisture and Mold Damage [58-6 at 13]**

Travelers reviewed the Nederveld report in late April [58-7 at 27]. Although Nederveld's report blamed the collapse on improperly spaced fasteners, Travelers relied instead on its mechanical engineer, Mr. Rambacher, who believed that the fasteners alone would not have been enough to cause the collapse

and who believed instead that the moisture had already been present. He told Travelers that he thought the collapse was likely an effect, rather than the cause, of the mold [58-7 at 27]. Critical to this working theory was the assumption that the homeowners had incorrectly set their Aprilaire Humidistat to 35 percent [58-7 at 28].

Travelers turned to another source to blame. The company's initial inspector (Dave Black) had taken moisture and humidity readings on February 6, 2021 after notice of the claim. He recorded a 68 percent relative humidity level in the home [66-6 Tr.40-41]. Travelers also relied on an unusually large water bill for an unoccupied home [66-4 at 2]. Additionally, Travelers relied on Mr. Rambacher's conclusion that the substantial mold growth had to result from at least 100 days of germination (dating backward from March 29, 2021) [66-15 at 6]. Using this, Travelers decided that moisture had built up for weeks, causing the ceiling to fall and the ensuing mold damage.

On May 12, Travelers determined that "the cause of loss was humidity/condensation resulting from the [humidifier] attached to the [furnace]" [58-7 at 29]. It notified the homeowners on May 24 that it would not cover the damage based on its finding [25-2]. Travelers cited the policy's exclusion for loss caused by "the presence or condensation of humidity, moisture or vapor, that occurs over a period of weeks, months, or years" [25-2; *see* 25-1 at 7 § I(4)]. In addition, Travelers informed the homeowners that the loss did not meet the policy's definition of a "collapse" [25-2; *see* 25-1 at 29, § 9(a)(1)]. Later, seemingly only in discovery, the homeowners advised that the humidistat Travelers initially thought was to blame was not controlling anything, which Nederveld confirmed [58-14 Tr.23].

The homeowners sued. They argued their policy covered the loss. They said the damage event qualified as a "collapse" under their policy and that the collapse was caused, at least in part, by "decay that is hidden from view," "weight of contents, equipment, animals, or people," or a "windstorm" to bring the loss within the policy's coverage as a "named peril" [*see* 25-1 at 29, § 9(b)]. They relied on the Nederveld forensic report to conclude that weight and decay substantially contributed to the collapse.

4

Additionally, the homeowners consulted a forensic engineer (Michael Mariscalco) who concluded that strong wind gusts on February 4-5, 2021 caused the ceiling panel to collapse [61-1 at 15]. Working off the Nederveld report, the claims notes, and wind data from a nearby airport, Mr. Mariscalco concluded that Nederveld was correct that the ceiling's collapse caused excessive moisture damage [*id.* 14-15]. The homeowners contend the total damages for restoring the home exceed $628,840.00.

## STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The non-moving party must present the court with evidence on which a reasonable jury could rely to find in his favor. *Weaver v. Speedway, LLC*, 28 F.4th 816, 820 (7th Cir. 2022). The court must construe all facts in the light most favorable to the non-moving party, viewing all reasonable inferences in that party's favor, *Bigger v. Facebook, Inc.*, 947 F.3d 1043, 1051 (7th Cir. 2020), and avoid "the temptation to decide which party's version of the facts is more likely true," *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003); *see also Joll v. Valparaiso Cmty. Schs.*, 953 F.3d 923, 924-25 (7th Cir. 2020).

With crossmotions, each party receives the benefit of all reasonable inferences drawn from the record when considering the opposing party's motion. *Tegtmeier v. Midwest Operating Eng'rs Pension Tr. Fund*, 390 F.3d 1040, 1045 (7th Cir. 2004) (citation omitted). In performing its review, the court "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Instead, the "court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Id.* The court must grant a summary judgment motion when no such genuine factual issue—a triable issue—exists under the law. *Luster v. Ill. Dep't of Corr.*, 652 F.3d 726, 731 (7th Cir. 2011).

## DISCUSSION

The parties apply Indiana law. Presented with no conflict of laws, and seeing no reason to apply another state's law, the court follows. *See Citadel Grp. Ltd. v. Wash. Reg'l Med. Ctr.*, 692 F.3d 580, 587 n.1 (7th Cir. 2012); *Auto-Owners Ins. Co. v. Websolv Computing, Inc.*, 580 F.3d 543, 547 (7th Cir. 2009); *Simon v. United States*, 805 N.E.2d 798, 805 (Ind. 2004). The homeowners request summary judgment on the coverage issue of their contract action and oppose Travelers' summary judgment motion as to all claims.[1]

A. *Breach of Contract.*

An insurance policy is a contract subject to rules of construction. *State Farm Mut. Auto. Ins. Co. v. Jakubowicz*, 56 N.E.3d 617, 619 (Ind. 2016); *Dunn v. Meridian Mut. Ins. Co.*, 836 N.E.2d 249, 251 (Ind. 2005). Contractual interpretation is generally a question of law, *Song v. Iatarola*, 76 N.E.3d 926, 933 (Ind. Ct. App. 2017), controlled by the parties' intent as expressed by clear contractual language, *City of Jeffersonville v. Env't Mgmt. Corp.*, 954 N.E.2d 1000, 1008 (Ind. Ct. App. 2011). "When confronted with a dispute over the meaning of insurance policy terms, Indiana courts afford clear and unambiguous policy language its plain, ordinary meaning." *Erie Indem. Co. v. Est. of Harris*, 99 N.E.3d 625, 630 (Ind. 2018).

The court interprets "policy terms from the perspective of the ordinary policyholder of average intelligence." *Ind. Farmers Mut. Ins. Co. v. Weaver*, 120 N.E.3d 280, 284 (Ind. Ct. App. 2019); *accord Erie Indem.*, 99 N.E.3d at 630; *Frankenmuth Mut. Ins. Co. v. Fun F/X II, Inc.*, 601 F. Supp.3d 330, 337 (N.D. Ind. 2022), *aff'd*, 61 F.4th 514 (7th Cir. Feb. 28, 2023). The court's job is "to ascertain and enforce the parties' intent as manifested in the insurance contract," *Berkshire Hathaway Homestate Ins. Co. v. Basham*, 113 N.E.3d 630, 634 (Ind. Ct. App. 2018)(citations omitted), to interpret a contract "so as to harmonize its provisions, rather than place them in conflict," and to look at the contract as a whole, *Dunn*, 836 N.E.2d at 252.

---

[1] The homeowners also seek a declaratory judgment (count one); but, overlapping the contract action (count two) as it does, the court need not separately consider a declaratory judgment. A declaratory judgment action would not proceed to a jury. And there is no cause for the court to entertain this count separately from the contract claim that today must proceed to a jury. *See Levy v. W. Coast Life Ins. Co.*, 44 F.4th 621, 629 (7th Cir. 2022); *Ray v. Bedi Trust*, 611 F. Supp.3d 567 577-78 (N.D. Ind. 2020); *see also* 28 U.S.C. § 2201(a); *Wilton v. Seven Falls Co.*, 515 U.S. 277, 288 (1995); *Envision Healthcare, Inc. v. PreferredOne Ins. Co.*, 604 F.3d 983, 986 (7th Cir. 2010).

Parties merely disagreeing about a provision's meaning doesn't render a provision ambiguous. *G&G Oil Co. of Ind. v. Cont'l W. Ins. Co.*, 165 N.E.3d 82, 87 (Ind. 2021). A court will only find terms ambiguous when intelligent policyholders could honestly disagree about the policy's meaning, else the court applies the plain and ordinary meaning of the policy's terms. *See id.*; *Erie Indem.*, 99 N.E.3d at 630. If ambiguity exists, courts interpret an insurance contract to favor the insured to further the policy's basic purpose of indemnity. *Eli Lilly & Co. v. Home Ins. Co.*, 482 N.E.2d 467, 470 (Ind. 1985); *Zeller v. AAA Ins. Co.*, 40 N.E.3d 958, 962 (Ind. Ct. App. 2015). Then this distinct rule of construction applies because of the "disparity in bargaining power" between insurer and the insured, *Auto-Owners Ins. Co. v. Harvey*, 842 N.E.2d 1279, 1283 (Ind. 2006)—that "the insurer drafts the policy and foists its terms upon the customer," *American States Ins. Co. v. Kiger*, 662 N.E.2d 945, 947 (Ind. 1996).

The policy provides additional coverage for "direct physical loss to covered property involving collapse of a building or any part of a building" [25-1 at 29, § 9(b)]. The policy defines a collapse as "an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its current intended purpose" [*id.* § 9(a)(1)]. For a collapse to be covered, at least as implicated here, it must be caused by a named peril in Coverage C, or "[d]ecay that is hidden from view, unless the presence of such decay is known to an insured prior to collapse or there are visible signs of water damage and the insured has not taken prompt action to prevent further damage" [*id.* § 9(b)(1), (b)(2), (b)(4) (quotes omitted); *see also id.* at 7, 33, Cover. C]. Three questions arise today from the policy language: (1) whether this was an abrupt collapse at all; (2) whether it rendered a portion of the home unusable or uninhabitable for its intended use; and (3) whether one of the named perils caused the collapse. The court finds that genuine triable issues remain on each question and preclude summary judgment.

1. *Abrupt Collapse.*

Travelers noted several times in adjustment that the ceiling collapsed, but the question today is whether the incident qualifies as a collapse within the policy's defined meaning—and particularly whether the collapse was "abrupt," with the proviso that any abrupt collapse must have rendered a portion of the home unusable or uninhabitable for its intended purpose. As the ones seeking coverage, the homeowners bear the burden of proving that coverage attaches. *See PSI Energy, Inc. v. Home Ins. Co.*, 801 N.E.2d 705, 727 (Ind. Ct. App. 2004); *Frankenmuth*, 601 F. Supp.3d at 337.

The policy requires a collapse to have been an "abrupt falling down or caving in" of any part of the home [25-1 at 29, § 9(a)(1)].[2] There is no dispute the ceiling fell down or collapsed. It just needs to have been abrupt. The policy leaves "abrupt" undefined.

The court applies the term's plain and ordinary meaning, *see Erie Indem.*, 99 N.E.3d at 630, with due regard to its dictionary definition, *see Reed v. Reid*, 980 N.E.2d 277, 289 (Ind. 2012). Abrupt means "occurring suddenly, unexpectedly, or without warning," *see Abrupt,* Oxford English Dictionary (2022); *see also Abrupt,* American Heritage Dictionary (2022) ("unexpectedly sudden"); *see, e.g. Malbco Holdings, LLC v. AMCO Ins. Co.*, 629 F. Supp.2d 1185, 1195 (D. Or. 2009) ("The word 'abrupt' has a plain meaning, namely sudden."). In application, courts afford this term this same meaning. *See Ass'n of Unit Owners v. State Farm Fire & Cas. Co.*, 670 F.Supp.2d 1156, 1163 (D. Or. 2009) (defining "sudden collapse" to mean one "manifesting abruptness or haste" and excluding "conditions that gradually lead to collapse"); *Kings Ridge Cmty. Ass'n v. Sagamore Ins. Co.*, 98 So.3d 74, 77 (Fla. Ct. App. 2012) ("characterized by or involving action or change without preparation or warning: unexpected"); *Clendenning v. Worcester Ins. Co.*, 700 N.E.2d 658, 660 (Mass. Ct. App. 1998) (distinguishing "sudden" collapse from a "degenerative process causing the collapse").

---

[2] The homeowners say Travelers should be barred from disputing this point because it didn't deny coverage for this reason, but the company's denial letter explicitly said the "collapse coverage in the policy [was] not applicable as the facts of the loss did not satisfy the collapse requirements in the policy" [25-2].

Travelers argues that the homeowners have not presented any evidence to show the ceiling drywall fell suddenly. Travelers suggests that, based on the Nederveld report (cited also by the homeowners), the ceiling board would have first sagged under the drywall's weight before eventually failing over time. The Nederveld report noted improper spacing of the drywall fasteners and likewise that a "process of rot typically requires wood material to be wet for a year or more of accumulated time." [58-9 at 5]. A sagging ceiling would have alerted the homeowners to the potential for a collapse, foreclosing its suddenness or unexpectedness. Travelers argues that sagging or decaying drywall could have been visible had the homeowners merely been home to see it.

In evidentiary contrast, the homeowners say they never noticed high humidity conditions prior to the collapse [66-1 Tr.45; 66-2 Tr.69-70]. Their friend who checked on the home during their absence likewise never noticed any high humidity condition or needed to make any repairs [58-3 Tr.16, 19]. No one witnessed the ceiling fall, and she estimates that she may not have been in the home for about two weeks before February 6, 2021 [58-3 Tr.12, 16]. The homeowners also offer opinions from a forensic engineer who explains that strong wind gusts, paired with the improperly spaced fasteners, caused an abrupt ceiling collapse and the resulting water damage [58-17 at 20]. Forensically, no water damage seemed to exist on the drywall around the collapsed opening that might have suggested a longer process than a sudden collapse of the ceiling [58-9 at 16].

On this record, a reasonable jury could credit either party's position—that the collapsed occurred abruptly or that it occurred over time. To note, this policy only requires the "falling down or caving in" to be abrupt, not that the cause behind the collapse to have been abrupt (else causes such as "decay" would make no sense). This genuine factual issue precludes summary judgment insofar as this part of the definition of "collapse" goes.

2. *Use for Intended Purpose.*

The policy also requires this abrupt collapse to have rendered part of the home unusable or inhabitable "for its current intended purpose" [25-1 at 29, § 9(a)(1)]. Travelers calls this a small hole with a quick fix such that a reasonable jury could not fairly characterize this room as unoccupiable for its designed use. The jury would receive photographs that show significant damage—not just from a piece of drywall and insulation, but water intrusion and mold. Travelers predicted a restoration period of six months [58-7 at 19]. Its mold testing service recommended respiratory protection gear for personnel working on the home, removal of carpeting and pads in the residence, and isolation of the affected areas [58-10 at 7]. A reasonable jury could find that a portion of the home was rendered unusable, indeed unlivable, by an abrupt collapse. A bedroom is meant for relaxing and sleeping, and a jury reasonably could say this was no longer a suitable one. The court denies summary judgment accordingly.

3. *Causation.*

The policy covers direct physical loss involving a collapse that was "caused by one or more" of the named perils [25-1 at 29, § 9(b)]. The parties disagree on the causation standard. The homeowners propose a "substantial or contributing factor" test. Travelers counters with an "efficient proximate cause" test. The court defines "cause" here to mean proximate cause—consistent with Indiana law and the policy's plain meaning.

Indiana law applies a substantial factor test to common law contracts, *see Parke State Bank v. Akers*, 659 N.E.2d 1031, 1034-35 (Ind. 1995); *Fowler v. Campbell*, 612 N.E.2d 596, 602 (Ind. Ct. App. 1993), but no one cites authority for extending this common law understanding to an undefined term in an insurance contract. Instead, Indiana law traditionally defines "cause" in insurance contracts to mean proximate cause.[3] *See, e.g., Scottsdale Ins. Co. v. Harsco Corp.*, 199 N.E.3d 1210, 1216 (Ind. Ct. App. 2022) (defining "caused, in whole or in part" in insurance policy to mean proximate cause); *Rozek v. American Family Mut.*

---

[3] Thus, the court denies the homeowners' motion to strike and motion for leave to file a surreply as moot.

*Ins. Co.*, 512 N.E.2d 232, 235 (Ind. Ct. App. 1987) (calling this definition "longstanding"). That the collapse covered by this policy could be caused by "one or more" of the named perils might give some pause and invite consideration of a substantial factor test until it is remembered that a "loss may have more than one proximate cause." *R. R. Donnelley & Sons Co. v. N. Tex. Steel Co.*, 752 N.E.2d 112, 138 (Ind. Ct. App. 2001); *see also Miller v. Bernard*, 957 N.E.2d 685, 697 (Ind. Ct. App. 2011) (same).

This record presents a triable issue on causation.[4] For instance, the homeowners posit that abnormally high wind gusts in early February 2021 caused the ceiling panel to collapse, supported by the opinion of a forensic engineer. Travelers counters this theory with a Ph.D. civil engineer (Dennis McCann) who opines that the bedroom ceiling collapse could not have occurred from wind-induced internal pressurization [61-3]. "Especially in a case of dueling experts…it is left to the trier of fact, not the reviewing court, to decide how to weigh the competing expert testimony." *Wipf v. Kowalski*, 519 F.3d 380, 385 (7th Cir. 2008). A reasonable jury could credit either engineer's theory.

More needs to be said. The form policy included as a named peril a windstorm, but the homeowners purchased special coverage that modified the named perils (in Coverage C) to mean all risks, except for those specifically excluded [25-1 at 7, 33, Cover. C]. "[E]xceptions, limitations and exclusions must be plainly expressed in the policy," *Am. Family Life Assurance Co. v. Russell*, 700 N.E.2d 1174, 1177 (Ind. Ct. App. 1998), and a reasonable jury could find that no exclusion applies here. Travelers argues one—a moisture exclusion that excludes "the presence or condensation of humidity, moisture or vapor,

---

[4] At times, an event that would be covered under a policy "sets into operation a chain of causation." *Hartford Ca. Ins. Co. v Evansville Vanderburgh Pub. Lib.*, 860 N.E.2d 636, 646 (Ind. Ct. App. 2007). The efficient proximate cause doctrine, arising in the context of all-risks policies, has been used to extend rather than contract coverage, and particularly in those scenarios in which a covered cause begins the chain of events only to conclude in a cause that was not covered by the policy. *See id.* When "a risk insured against operates to subject the insured property to a risk not insured against, the loss is covered" nonetheless. *Assoc. Aviation Underwriters v. George Koch Sons, Inc.,* 712 N.E.2d 1071, 1075 (Ind. Ct. App. 1999). The court need not decide today whether such a test applies here in a named-perils policy, and just like an all-risks policy, even if limited to the language in the endorsed Coverage C, because the record presents a triable issue on proximate cause. *See, e.g., Fisher Comms., Inc. v. Travelers Prop. Cas. Co. of Am.*, 2012 U.S. Dist. LEXIS 193374, 10-12 (W.D. Wash. Sept. 4, 2012) (finding efficient proximate cause inapplicable in named-perils policy).

that occurs over a period of weeks, months or years" [25-1 at 7, § I(4)]. Travelers bears the burden of proving this exclusion applies. *Erie Ins. Group v. Sear Corp.*, 102 F.3d 889, 892 (7th Cir. 1996).

This exclusion begs a timing question—whether the moisture built up over weeks rather than, say, mere days. Travelers argues that the ceiling collapse was not the cause of the water intrusion but the effect of that—that long-existing moisture eventually soaked the drywall so thoroughly that the ceiling eventually fell from the erroneously-spaced fasteners. Travelers rests primarily on three pieces of evidence: a water bill for the month leading up to the discovery of the collapse on February 6, 2021 that seems to show an inordinate amount of water usage for a home where no one is living, the relative humidity levels in the house upon inspection, and its inspector's view that the drywall had become wet and fallen from the misused drywall screws. Travelers also cites opinion from its mechanical engineer (Richard Rambacher) who concluded that it would have taken over 100 days for mold to grow to the extent it had in the home. Travelers argues that all this evidence indicates that moisture was spreading throughout the home in the weeks leading up to the collapse.

Underscoring the factual issue that remains for this jury, the homeowners cite their forensic engineer's opinion that the water stemmed from the mix of cold and hot air after the ceiling panel fell from the unusual wind gusts, not from something more historical. They counter the theory of a malfunctioning humidifier by pointing out that Travelers' initial inspector, while measuring high humidity, attributed this dynamic to the ceiling collapse and opening [66-6 Tr.44]. The homeowners additionally offer evidence that the humidifier knob was not wired to control the humidity in the home. They also offer evidence to contest the inference from the significant water bill—namely that, according to their forensic engineer, the water usage could have stemmed from the humidifier's drainage [61-2 Tr.58]. A reasonable jury could credit either side's version of the facts.

The homeowners also present other causation theories, likewise in factual dispute upon review, though the court need not resolve these to reiterate that triable issues remain on coverage. Taking the

12

evidence and all reasonable inferences in favor of the non-movant when weighing each side's summary judgment motion, several genuine issues of material fact remain that require a trial. The court denies summary judgment on the contract claim accordingly.

    B.  *Bad Faith.*

The homeowners allege that Travelers acted in bad faith—in both its investigation and in denying coverage. They claim that Travelers investigated with the preexisting intention of denying the claim and only denied the claim once the company realized it could not collect damages from a third-party. Travelers responds that its investigation was thorough and rational.

Indiana law has long recognized a legal duty, implied in all insurance contracts, for an insurer to deal in good faith with its insured. *Erie Ins. Co. v. Hickman*, 622 N.E.2d 515, 518 (Ind. 1993). Although the precise extent of this duty has not been conclusively defined, often to prevail on a bad faith claim a plaintiff must prove the insurer "(1) made an unfounded refusal to pay policy proceeds; (2) caused an unfounded delay in making payment; (3) deceived the insured; or (4) exercised an unfair advantage over the insured to pressure the insured into settling its claim." *Brandell v. Secura Ins.*, 173 N.E.3d 279, 284 (Ind. Ct. App. 2021). "Poor judgment and negligence do not amount to bad faith; there must also be the additional element of conscious wrongdoing." *Id.* "A finding of bad faith requires evidence of a state of mind reflecting dishonest purpose, moral obliquity, furtive design, or ill will." *Colley v. Ind. Farmers Mut. Ins. Grp.*, 691 N.E.2d 1259, 1261 (Ind. Ct. App. 1998).

The "lack of diligent investigation alone is not sufficient to support an award" for bad faith, *Hickman*, 622 N.E.2d at 520; *Brandell*, 173 N.E.3d at 287, nor is a mere denial of coverage, *Hickman*, 622 N.E.2d at 520. "That insurance companies may, in good faith, dispute claims, has long been the rule in Indiana." *Id.* A "good faith dispute about the amount of a valid claim or whether the insured has a valid claim at all will not supply the grounds for a recovery in tort for the breach of the obligation to exercise good faith." *Id.* Only when an insurer "denies liability knowing that there is no rational, principled basis

13

for doing so has [it] breached its duty." *Id.* There must be clear and convincing evidence that "the insurer had knowledge that there was no legitimate basis for denying liability," *Ind. Ins. Co. v. Plummer Power Mower & Tool Rental, Inc.*, 590 N.E.2d 1085, 1093 (Ind. Ct. App. 1992), not "[s]peculation and conjecture," *Cooney v. Casady*, 735 F.3d 514, 519 (7th Cir. 2013).

The homeowners assert that Travelers had no rational reason to deny coverage. Indiana law requires that a decision to deny coverage be rational. *Hickman*, 622 N.E.2d at 520. Proving that a decision was irrational is a "rather heavy" burden for plaintiffs to meet. *Lummis v. State Farm Fire & Cas. Co.,* 469 F.3d 1098, 1100 (7th Cir. 2006). No reasonable jury could find bad faith for the denial of coverage here.

No reasonable jury could say Travelers lied to the homeowners about the cause of their home's damage when the cause still remains unknown or undecided. The record likewise presents competing evidence as to whether the policy affords coverage for this loss, so a reasonable jury could not find that Travelers lacked a rational basis for its denial or that it acted with a furtive design or dishonest purpose. Indeed, even as the homeowners recount, Travelers received information over time—after the initial report of an ice dam appeared unrealistic—and ultimately relied on information and conclusions that an inspector, engineer, or other specialist communicated to the company between February 6, 2021 and May 24, 2021 when it denied coverage. The company at times scrutinized this information. Any subsequent choice to take its mechanical engineer's opinion at face value cannot on this record be called bad faith; indeed, that would merely invite the jury to speculate. *See Hickman*, 622 N.E.2d at 520 ("lack of diligent investigation alone is not sufficient to support an award"). A jury may not credit the company's decisionmaking—a jury may even dislike it—but that same jury could not reasonably conclude that Travelers acted without a principled basis or in bad faith.

Nor could a reasonable jury conclude that Travelers caused an unfounded delay or inadequately investigated the claim. The report of a possible ice dam and the wintry conditions of February took some time before engineers could safely inspect the roof. Travelers received a roof report in late March 2021.

14

Nederveld issued its report in April 2021. Travelers consulted its retained mechanical engineer (Rambacher), and thereafter told the homeowners of the denial of coverage on May 24, 2021.

The homeowners cite their industry witness and his opinion that Travelers' failure to interview Ms. Brown, the neighbor watching the home, was "inexplicable." They argue that, for the humidity exclusion to have applied, Travelers would have needed to know the last time she was in the home, which she likely would have remembered better had she been interviewed sooner. This is speculative on this record, and indeed speculative that her estimation (because she kept no notes) would be any different than her testimony since. Their industry witness offers other conclusions based on how he weighs the facts, but the law requires clear and convincing evidence of bad faith, and that has not been presented here. He says Travelers conducted a poor investigation, but under the law that isn't enough. *See Hickman*, 622 N.E.2d at 520; *Brandell*, 173 N.E.3d at 287.

He says Travelers misrepresented facts but that isn't evident from this record. And even he conceded in his deposition that until Travelers brought in Richard Rambacher to consult, Travelers conducted the investigation correctly [78-2 Tr.64], so it proves unclear when the homeowners believe bad faith began and a proper investigation ended.[5] Mere disagreement with Travelers' mechanical engineer, and favor for Nederveld's report instead, which this industry witness does, isn't evidence of bad faith—that is a rational choice between two competing views of the facts. And such a rational choice isn't bad faith as a matter of law. *See Hickman*, 622 N.E.2d at 520. Perhaps his opinions support a finding of poor judgment or even negligence by Travelers, but not requisitely the company's knowledge that it lacked any legitimate basis to deny liability—not when it acted on opinions from inspectors and a mechanical engineer at the time that eluded clear signs of error. *See Brandell*, 173 N.E.3d at 287-88; *Ind. Ins. Co.*, 590 N.E.2d at 1093.

---

[5] He testified that, "when we get to the point where they start talking about talking to [Mr.] Rambacher instead of Nederveld and the AprilAire system, that that is where they ran afoul. I think that is where they started looking for a way out of this claim."

The homeowners say Travelers' mechanical engineer never visited the home, but neither did their forensic engineer. The homeowners fault Travelers for "expert shopping" and stopping only when it found the reason it needed to deny the claim, but both parties abandoned their initial first theory and consulted other specialists. They criticize Travelers for focusing on subrogation only—either warnings on the HVAC system or contractors who may have installed the drywall incorrectly; though these questions may have been explored, no reasonable jury could say the company considered these options to the detriment of the overarching coverage investigation. The homeowners allude to "fishy" communications, but "fishy" is nearly by definition nothing clear and convincing, particularly on this record. *See Ind. Ins. Co.*, 590 N.E.2d at 1093. And the claims notes show regular and accurate communication between the parties. Travelers advised of pending engineering or other reports and the need to await a coverage decision until it received them. Nothing in the record reflects, for a reasonable jury, a subversive or dishonest motive.

In the end, the homeowners seek to put Travelers in a catch-22—the homeowners simultaneously argue that Travelers should have denied their claim earlier, without all the reports, while also faulting the company for concluding the investigation when it did. The court finds that no reasonable jury could find that Travelers acted in bad faith. The court grants summary judgment on the bad faith claim.

CONCLUSION

Accordingly, the court DENIES AS MOOT the motion to strike and motion for leave to file a surreply [80], DENIES the homeowners' partial summary judgment motion [56], GRANTS IN PART and DENIES IN PART Travelers' summary judgment motion [65], granting summary judgment on the declaratory judgment claim (count one) as unnecessary and duplicative and on the bad faith claim (count three) and denying summary judgment on the contract claim (count two).

SO ORDERED.

September 29, 2023                    *s/ Damon R. Leichty*
                                       Judge, United States District Court