UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

JOHN FORST and CHRISTINE HOPKINS

Plaintiffs,

v().

TRAVELERS HOME AND MARINE
INSURANCE COMPANY

Defendant.

CAUSE NO. 1:21-CV-227 DRL

OPINION AND ORDER

Travelers Home and Marine Insurance Company seeks to exclude the testimony of John Forst's and Christine Hopkin's opinion witness, Michael Mariscalco, under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). The court denies the motion, except as to his opinion about mold causation.

BACKGROUND

John Forst and Christine Hopkins own a home in Huntertown, Indiana. While they were on vacation, a friend discovered water and mold damage in their home. The homeowners filed a claim with Travelers as their insurer. Travelers denied coverage. The homeowners pursued contract and bad faith claims—and only the contract claim remains for trial. The court's contemporaneous summary judgment ruling offers a more exhaustive recitation of the facts, but this synopsis suffices to start.

The homeowners retained Michael Mariscalco to review the opinions of Travelers' retained engineer (Richard Rambacher) and to help determine the cause of the ceiling failure and water damage. Mr. Mariscalco is a professional engineer with over 35 years of experience, including building design and construction as well as risk assessment and failure analysis [61-1]. He earned bachelors and masters degrees in mechanical engineering from the University of Dayton. He is a registered professional engineer in eight states, including Indiana, and holds memberships in a number of professional engineering

organizations. He has engaged in a number of expert and forensic investigations. He has worked for QEI Engineers since 1996, with prior research and engineering experience dating back to 1975.

He proposes to opine as follows [61-1 at 14-16]:

1. The 1/2" drywall ceiling panel in the [the] Master Bedroom was improperly installed during the original construction of the residence, which violated both ASTM and Gypsum Association standards in effect at the time.

2. During the period of time that the [homeowners] were away from home, the HVAC system was controlled by a Bryant Evolution programmable thermostat, which maintained the interior of the residence at a temperature of 60 degrees F, and a nominal relative humidity of 25%, which results in a dew point temperature of 24 degrees F.

3. There is no evidence from which to conclude that the furnace and Aprilaire humidifier were not operating properly during the time that the house was unoccupied.

4. The moisture conditions associated with a temperature of 60 degrees F, 25% RH, and a 24 degree F dewpoint are not sufficiently high to promote the water damage or mold growth that was documented to have occurred, under ordinary operating conditions.

5. Continuously gusting westerly winds, during a 17+ hour period of time, from 2/4/2021 through 2/5/2021, imposed fluctuating pressures in the attic space above the Master Bedroom ceiling, and against the improperly installed ceiling panel, causing it to flex repeatedly, and ultimately fall from the ceiling.

6. When the ceiling panel fell, the opening introduced outside air into the space at temperatures well below the humidity-controlled 24 degree F dew point.

7. The introduction of cold outside air into the Master Bedroom caused the 25% RH interior water vapor to condense, or crystallize with subsequent melting, and accumulate on the various interior surfaces.

8. Cold air continued to enter the house through the ceiling opening while the furnace and humidifier operated to maintain the respective temperature and humidity setpoints, which resulted in continuous water vapor condensation and crystallization inside the home.

9. Water accumulation on the various building materials inside the home resulted in significant water damage, and ultimately mold growth, which is a predictable, well known, occurrence.

10. There is no evidence of excessive moisture in the home prior to the ceiling drywall panel failure, due to the operation of the Aprilaire humidifier, and accordingly, the ceiling drywall panel failure was not the result of excessive moisture in the home at the time of the incident.

11. Accordingly, given the gusting wind conditions prior to the DOL, the ceiling panel failure was a sudden and accidental occurrence, and all of the damages that ensued were the result of that sudden and accidental occurrence.

12. The Nederveld report[1] is based upon a reasonable investigation of the event, and provides a fair analysis of the cause of water intrusion into the [] home, and the related water damage.

13. [Mr.] Rambacher's opinions on the causation of water intrusion, as reported in the Travelers notes, are not consistent with the available evidence, or basic scientific and engineering principles, and accordingly, [his] work, or comments and opinions to Travelers, would not constitute a reasonable investigation.

14. Having retained both Nederveld and [Mr.] Rambacher to evaluate causation in this matter, Travelers opted to deny the [homeowners'] damages claims based solely upon [Mr.] Rambacher's opinion(s), and without due consideration of the opinions of Nederveld.

15. In fact, [Mr.] Rambacher admitted in his deposition testimony that he never formed any opinions in this matter, and accordingly, there is no opinion in the record to contradict the opinions of Nederveld, or otherwise support Travelers' decision to deny the [] claims.

16. [Mr.] Rambacher, and by extension Travelers, did not perform a reasonable investigation into the cause(s) of [the] losses in this matter, and accordingly, Travelers' decision to deny the [homeowners'] insurance claims was both arbitrary and capricious.

Travelers seeks to exclude his opinions for three reasons: insufficient or inappropriate data, lack of acceptance in the relevant community, and his lack of qualifications and analysis on mold.

STANDARD

A witness may testify in the form of an expert opinion when (1) the witness is "qualified as an expert by knowledge, skill, expertise, training, or education;" (2) the testimony is "based on sufficient facts or data;" (3) the testimony is "the product of reliable principles and methods;" and (4) the witness has "reliably applied the principles and methods to the facts of the case" in such a way that the testimony will "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702.

---

[1] The Nederveld report refers to the report prepared by James Eric Bates, a forensic engineer at Nederveld, Inc., who conducted a site visit and investigation of the home during the claims adjustment period on March 29, 2021.

3

Although analysis under Rule 702 remains flexible at all times, *Daubert*, 509 U.S. at 594, the fundamental considerations of what makes expert opinion admissible are well understood, *see Constructora Mi Casita, S de R.L. de C.V. v. NIBCO, Inc.*, 448 F. Supp.3d 965, 970-71 (N.D. Ind. 2020).

In short, the Federal Rules of Evidence strike a balance between two competing concerns: apprehension of the free-for-all admission of unreliable theories that might baffle juries and a "stifling and repressive scientific orthodoxy" that might inhibit new truths or legitimate cases. *Daubert*, 509 U.S. at 596. While preserving that balance, the *Daubert* analysis is not a substitute for crossexamination, contrary and compelling evidence, thoughtful jury instructions, and other methods inherent in federal trials to challenge shaky evidence. *Id.*; *see also Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 766 (7th Cir. 2013). The proponent of expert testimony must establish its admissibility by a preponderance of the evidence. *Varlen Corp. v. Liberty Mut. Ins. Co.*, 924 F.3d 456, 459 (7th Cir. 2019).

The court needn't conduct an evidentiary hearing here. No party has requested one. The briefing, proffered expert report, records from the claim's adjustment, exhibits, and deposition testimony also permit the court to rule. *See, e.g., Kirstein v. Parks Corp.*, 159 F.3d 1065, 1067 (7th Cir. 1998); *Target Mkt. Pub., Inc. v. ADVO, Inc.*, 136 F.3d 1139, 1143 n.3 (7th Cir. 1998).

DISCUSSION

Travelers argues that Mr. Mariscalco chose his data poorly. "An opinion witness must have a sound factual basis to be declared an expert." *Scci Hosps. of Am., LLC v. Home-Owners Ins. Co.*, 571 F. Supp.3d 942, 950 (N.D. Ind. 2021). Even if eminently qualified, experts cannot offer opinions based solely on their say-so. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 157 (1999); *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Expert testimony must be based on sufficient and known facts. Fed. R. Evid. 702(b), 703; *see Daubert*, 509 U.S. at 590; *see, e.g., Wasson v. Peabody Coal Co.*, 542 F.3d 1172, 1176 (7th Cir. 2008) (one sale was insufficient basis to calculate average of sales over twenty years); *Ervin v. Johnson & Johnson,*

4

*Inc.*, 492 F.3d 901, 904-05 (7th Cir. 2007) (temporal relationship was unreliable to show causal relationship between medication and symptoms without physiological explanation or supporting data).

The court's gatekeeping role doesn't make it the trier of all facts that relate to an opinion witness's testimony. *Stollings*, 725 F.3d at 765. The "soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000). *Daubert* isn't meant to limit expert testimony to "conclusions [that] are unimpeachable." *Stollings*, 725 F.3d at 765. A "valid and properly applied methodology" may leave conclusions open to "doubt"—that doubt that good trial lawyers explore in crossexamination and that the jury weighs and credits as it sees fit as the factfinder. *Id.* at 766; *see Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 807 (7th Cir. 2013)

The court's analysis thus focuses on the methodology, not specific inputs. *See Manpower*, 732 F.3d at 807 (reversing court's consideration of the quality of data); *see also Lees v. Carthage Coll.*, 714 F.3d 516, 525 (7th Cir. 2013) (quoting *United States v. Mikos*, 539 F.3d 706, 711 (7th Cir. 2008) (admissibility not dependent on "flaw-free set of data"). The court risks abusing its discretion by "drill[ing] down to a third level in order to assess the quality of data inputs." *Manpower*, 732 F.3d at 807. The "critical inquiry is whether there is a *connection* between the data employed and the opinion offered" and whether the expert employed the kinds of facts or data on which experts in the field would "reasonably rely." *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 781 (7th Cir. 2017); *see also* Fed. R. Evid. 703.

Travelers argues that Mr. Mariscalco erred by relying on wind data from an airport over fifteen miles from the home to draw conclusions about wind gusts in early February that may have caused the ceiling failure. Travelers also faults Mr. Mariscalco for not verifying that the wind measurements at the home matched the measurements at the airport. Travelers also criticizes him for failing to account for trees around the home. Travelers points to another measurement, CoreLogic, one its own opinion witness chose to use as a more accurate datapoint.

5

The homeowners counter that the data Travelers utilizes is merely an estimate, not actual observed wind data. They explain too that Mr. Mariscalco's opinion focuses on wind gusts, not prevailing windspeeds, further justifying his choice of data. They offer reasons why a jury might (or might not) credit the data he chose—as well as the data suggested by Travelers either from CoreLogic or another county weather station—and the jury retains its sole function to weigh this data. The impact of trees may be a source of crossexamination, albeit only slight if there was but one fir tree, but that too is left to the adversarial process, not the assessment of whether to exclude his opinion as unreliable.

Travelers also argues the Mr. Mariscalco used a coefficient outside the generally accepted coefficients in ASCE/SEI 7. The old standard of general acceptance is no longer the test, but it remains a factor in the reliability analysis. *See Daubert*, 509 U.S. at 593-94. Mr. Mariscalco says this coefficient pertains primarily to commercial structures, not residential homes, and not necessarily applies to wind gusts [61-2 at 31-32]. Travelers effectively contests the weight that should be attributed to this data, and thereby Mr. Mariscalco's opinion, but that is reserved to crossexamination at trial and to the jury. *See Lees*, 714 F.3d at 525 ("the relevant question for admissibility purposes is not whether the [industry] guidelines are controlling," or "even how persuasive they are," but "whether consulting them is a methodologically sound practice on which to base an expert opinion").

Travelers next argues that Mr. Mariscalco failed to consider water usage in the home or personally inspect the home, rendering his investigation incomplete and opinions unreliable. Travelers invites the court to bar him from testifying about moisture conditions. But it is not uncommon for opinion witnesses, often retained later in an investigation or during the course of litigation, to rely on the evidence preserved and reports prepared by other investigators. An opinion witness cannot be a mere mouthpiece for another expert's opinion, *see United States v. Truitt*, 938 F.3d 885, 891 n.1 (7th Cir. 2019), but he can absolutely rely on reports (even hearsay), photographs, testimony, and a host of other sources of fact— again so long as this information proves to be that reasonably relied upon by members of his field, *see*

Fed. R. Evid. 703; *United States v. Conn*, 297 F.3d 548, 554 (7th Cir. 2002) (expert testimony "need not be based on first-hand knowledge of the facts of the case").

Both issues that Travelers raises here go to the weight of Mr. Mariscalco's opinions, not their admissibility. Mr. Mariscalco opines that the ceiling panel's failure caused the condensing humidity and water intrusion into the home that led to this loss. He relies in part on the Nederveld report—prepared by a cause-and-origin specialist who reached a similar conclusion after a site visit in March 2021, early in the claims analysis. On this record, a personal examination of the home was not required. Mr. Mariscalco also considered the home's water usage and explains why there might have been a substantial water bill for the month preceding the damage, though no one was home [61-2 at 58-59]. Whether a jury might credit this explanation, this issue isn't such, on the entirety of this record, to render Mr. Mariscalco's opinion inadmissible. Travelers can make its case of credibility to the jury.

Aside from merely challenging Mr. Mariscalco's datapoints, Travelers contests his qualifications, analysis, and testing to offer a specific opinion about mold. Mr. Mariscalco admitted he was not an expert in mold and pointed out that mold sampling and growth was his partner's expertise. His partner was not consulted. His partner never reviewed the report. Mr. Mariscalco says it would depend on the mold species, conditions, humidity, temperature, and food source—"a lot of variables"—to say mold could grow to the size it had between February 4 to February 6, 2021. He says he never conducted this analysis.

The homeowners argue that, like many engineers, Mr. Mariscalco has acquired over several decades basic working knowledge about mold and mold growth, though they cite nothing specific. They also note that it does not take a mold expert to draw his conclusions. Even Mr. Mariscalco calls mold growth a "predictable, well known[] occurrence." The homeowners explain that he is not opining about the type or properties of the mold, its relative safety concerns, or the necessary remediation work.

It would not be a stretch for a professional engineer of more than 35 years to have some working knowledge of mold and to understand that mold can come generally from moisture, but a jury knows

7

this already without being told. That point isn't one that demands Rule 702 testimony. Most any layperson understands that moisture can cause mold (sometimes called a question of general causation).

This opinion is different. Mr. Mariscalco isn't ostensibly opining about any structural damage from mold—the subject matter of the cases the homeowners cite. Mr. Mariscalco's opinion necessarily presupposes that the mold grew—not could but did grow—to the size it did, abruptly and within a short two or three days because of the temperature, humidity, food source, and other conditions that serve as variables from this ceiling collapse, and not from historical conditions or something else. To this point, experts may agree that mold can grow quickly from moist conditions within 24 to 48 hours, but the scale and visibility of this contamination depends on a great many variables (as the parties agree). *See, e.g.,* EPA, 402-K-02-003, *A Brief Guide to Mold, Moisture, and Your Home* 10 (2012) at 10; FEMA, *Dealing with Mold and Mildew in Your Flood Damaged Home* 2; CDC, *Invasive Mold Infections in Immunocompromised People*, https://www.cdc.gov/mold/invasive-mold-infections.htm (June 6, 2019). That is the precise question the jury must answer to reach a coverage decision, but an opinion generally about the link between moisture and mold does not aid the jury in answering this question. Such an opinion is not helpful when the jury already knows it. *See* Fed. R. Evid. 702(a); *Daubert*, 509 U.S. at 591.

Nor reliable is his causation opinion on this record—not when he has not followed the method or done the homework even he says would be necessary to develop a reliable opinion. *See* Fed. R. Evid. 702(b, c); *Kumho Tire*, 526 U.S. at 152 (witness must "employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of [the] expert in the relevant field"); *Constructora Mi Casita*, 448 F. Supp.3d at 973. He says he lacks the expertise. He says he performed none of the calculations or marshaled the necessary variables to mold growth to opine whether the mold grew to this size on February 6, 2021 because of the ceiling collapse [61-2 at 91], and the court takes him at his sworn word. His report may allude to certain necessary variables but not his method in accounting for them.

And however obtained, "qualifications must provide a foundation for an expert to answer the specific question." *Constructora Mi Casita*, 448 F. Supp.3d at 970. For instance, just because a person is a doctor doesn't mean she can answer all medical questions. *See, e.g., Gayton v. McCoy*, 593 F.3d 610, 617-18 (7th Cir. 2010) (allowing physician to opine about effects of vomiting on body but not pharmacological effects of drugs on heart). Likewise, just because one is a professional engineer doesn't mean he can answer all questions about mold. The homeowners seem to intend to ask Mr. Mariscalco to opine not just that mold can come from moisture (what a jury already knows), and that the ceiling's failure resulted in significant water deposits on the interior surfaces of the home (something he can say), but that this ceiling collapse and water development "ultimately caused the . . . mold growth that was documented to have occurred" [61-1 ¶ 47] (something beyond his experience and analysis on this record).

In review of Mr. Mariscalco's report, he cites the Nederveld report as having determined, not just the general proposition that condensation can result in bio-organic growth, but that this bio-organic growth occurred because of the master bedroom ceiling falling. He also cites Dr. Kathleen Parrott from Virginia Tech University, and her view that mold grows best on damp or wet organic material, and her view on the species dependency, water content, humidity, temperature, and speed at which molds might grow (even within 24 to 48 hours). Perhaps Nederveld can render its opinion. Perhaps Dr. Parrott could qualify. But taking his testimony to heart, Mr. Mariscalco hasn't linked the variables he says matter to any causative opinion of abruptly visible mold of this scale, and he cannot merely regurgitate Nederveld's opinion as his own, much less bootstrap it.

Perhaps more was to be offered here, but the homeowners only cite Mr. Mariscalco's credentials generally as a professional engineer—even then no particular expertise about mold that he has developed in his time in that profession—and credentials alone don't make an expert. *See Clark v. Takata Corp.*, 192 F.3d 750, 759 n.5 (7th Cir. 1999). The homeowners had the burden to show this opinion's admissibility. *See Downing v. Abbott Lab'ys*, 48 F.4th 793, 809 (7th Cir. 2022). They have not met it.

CONCLUSION

Accordingly, the court GRANTS IN PART and DENIES IN PART Travelers' motion to exclude testimony from Michael Mariscalco [60].

SO ORDERED.

September 29, 2023                                         *s/ Damon R. Leichty*
                                                           Judge, United States District Court